Argued September 16, affirmed September 28, rehearing denied October 19, 1920.

## TAYLOR v. TRIPP.

(191 Pac. 1054.)

**Logs and Logging—Agreement to Furnish Logs and Advance Money Held Indivisible.**

1. An agreement by defendants to furnish logs for the operation of plaintiff's sawmill and to advance the money necessary therefor in return for the ties cut from the logs at a stated price, and which gave defendants a lien on the mill and the side lumber, was indivisible so that defendants' breach of its contract to furnish the logs terminated the entire contract.

Logs and Logging—Evidence Held to Show Breach of Contract to
    Furnish Logs.

2. Evidence that during the period of high water defendants
furnished less than half the quantity of logs they agreed to furnish
daily for a year *held* to support the trial court's finding that de-
fendants breached the contract.

Logs and Logging—Right to Lien Under Contract Lost by Breach.

3. A lien which is created only by the terms of a contract for
furnishing logs and advancing money to plaintiffs does not exist
independent of the contract, and is lost by defendants' breach of
its promise to furnish the logs.

Contracts—Party can Treat Contract as Terminated by Breach and
    Recover Profits.

4. Though a party cannot rescind a contract and thereafter re-
cover damages for its breach, he can elect to treat a breach by the
opposite party as terminating the contract, and thereafter recover
the loss he sustained by reason of the other party's failure to per-
form his agreement.

From Lane: GEORGE F. SKIPWORTH, Judge.

Department 2.

On October 26, 1917, the plaintiffs were the owners
of a sawmill on Poodle Creek, near Noti, in Lane
County. They were experienced in that line of busi-
ness, but were without money to purchase sawlogs or
operate the mill. The defendants were in the timber
and tie business, but were not engaged in the manu-
facture of lumber. They had sufficient funds to sup-
ply the mill with logs and to finance its operation.
Under these conditions, on that date the plaintiffs
and the defendants entered into a written contract by
which the latter agreed to supply sufficient logs and
timber to keep the plaintiffs' mill running at its full
capacity, estimated at about 20,000 feet a day, and
to make delivery into the mill-pond at a cost not to
exceed $5 per thousand feet.

The plaintiffs agreed to manufacture the timber
into railroad ties and lumber. That portion thereof
which was not suitable for ties was to be made into

side lumber. The ties were to be the property of the defendants, for which they were to pay the plaintiffs $8 per thousand feet, less the actual cost of logging and stumpage, which was not to exceed $5 per thousand feet. The side lumber was to belong to the plaintiffs. The defendants agreed to pay for the logging and stumpage, and to advance to the plaintiffs the money necessary for sawing and manufacturing the ties and lumber. Such advances were to be charged against the $8 per thousand feet, and if the expenses of operating the mill should exceed the amount to be paid to the plaintiffs, the defendants were to make further advances of amounts equal to 50 per cent of the market value of the side lumber in the yard. Monthly settlements were to be made. The contract also provided:

"It is further mutually agreed by and between the parties hereto that breakages, strikes, unavoidable accidents, shortage of water for driving purposes, and anything happening beyond the control of either of the parties to this contract, shall operate as a suspension of the strict compliance with the terms of this contract during the time that the operations are necessarily closed by reason of such unavoidable cessation of operations."

A lien upon the sawmill and the side lumber was created in favor of the defendants for the faithful performance of the contract on the part of the plaintiffs, for moneys that might be advanced. Active operations were to commence on or before November 10, 1917, and the contract was to remain in force for the period of one year. On November 26th the parties executed a supplemental agreement, which is not material to this decision.

The plaintiffs' testimony tends to show that the plaintiffs had the mill ready for operation about

November 15th. The first logs were delivered about December 7th, and the mill was started on the following day.

For cause of action it is alleged "that the plaintiffs faithfully performed the agreements on their part agreed to be performed, and entered into the operation of said sawmill upon the logs furnished by the defendants, as soon as the defendants began to furnish logs in sufficient quantity to permit the operation of such sawmill"; that the defendants wrongfully refused and neglected to comply with their contract; that they have furnished not to exceed 700,000 feet of sawlogs, and not any more timber than was required to run the mill 35 days at full capacity; that about March 1, 1918, the defendants ceased to furnish any logs; that by reason thereof the plaintiffs were compelled to shut down the mill; that because of the breach of the contract by the defendants the plaintiffs were able to operate the mill only about 50 days; that the defendants wholly abandoned any attempt to perform the contract; that the plaintiffs thereby have been deprived of the use and operation of the mill and of the profits to be made under the contract; and that if the defendants had fulfilled their part, the plaintiffs would have been able to saw and make into lumber more than 4,000,000 feet of timber, for which they would have received $3 per thousand feet and the side lumber, from all of which they would have made a profit of $9,833.33, for which amount they ask judgment.

Prior to March 31, 1918, the defendants had paid out and advanced to the plaintiffs under the contract $7,051.88, at which time the amount due for the sawing was only $4,491.16, leaving an excess of $2,560.72. Concurrent with the filing of the complaint in plain-

tiffs' action, the defendants brought a separate suit against them for the balance of such advances, in which they prayed for a lien upon the sawmill and side lumber to secure payment of the same, and for a decree of sale.

In the action the defendants deny damages, admit the execution of the contract, and claim to have made delivery of about 800,000 feet of logs and to have paid the plaintiffs for the sawing of 740,455 feet. They allege that the mill was out of repair and was not ready for operation until December 1, 1917. They rely upon the clause of the contract above quoted, as to breakages, strikes, shortage of water, and "anything happening beyond the control of either of the parties." They allege that Poodle Creek is a very small stream, and had not a sufficient flow of water for the driving of logs; that when it appeared that the sawmill would not be ready and there was a shortage of water, the plaintiffs "waived and modified the provision of the said contract that these defendants should deliver into the said mill-pond of said sawmill the amount of sawlogs per day specified"; and that, pursuant to such waiver, the defendants delivered about 800,000 feet of logs, 350,000 feet of which were hauled by horses, and 450,000 floated on the waters of the creek. The defendants claim to have about 500,000 feet ready for delivery, and that they actually delivered to the plaintiffs 60,000 feet which the latter refused to saw. They further allege that, owing to the demand of the United States for men in the army and navy, they were unable to procure labor, a matter over which they had no control; and that under the contract as modified the plaintiffs agreed to accept such logs as the defendants could deliver, as full performance of

the contract in regard to quantity. By way of equitable relief in the action, the defendants plead the advances made on the contract, and ask that the action be abated, and that they have a decree for the balance of the amount advanced.

By order of the court the two cases were consolidated and tried in equity. To ascertain the amount of plaintiffs' damages, a jury was called, which found damages for the plaintiffs in the sum of $500. The court rendered judgment for this amount, refused to foreclose the defendants' lien, and dismissed their suit and the counterclaim in this action, upon the ground that they had violated the contract. The defendants appeal, contending that the provision of the contract relating to the lien for advances is an independent covenant; that the lien should have been foreclosed; that on March 31, 1918, the plaintiffs repudiated and terminated the contract, by refusing to saw the 60,000 feet of logs in the pond; that by reason thereof they were not entitled to any damages; that the evidence showed a waiver of the terms of the contract as to the delivery of the logs; and "that the evidence of the whole case showed that the plaintiffs were not entitled to any damages."

AFFIRMED. REHEARING DENIED.

For appellants there was a brief over the names of *Mr. H. E. Slattery* and *Mr. A. C. Woodcock,* with an oral argument by *Mr. Slattery.*

For respondents there was a brief with oral arguments by *Mr. O. H. Foster* and *Mr. C. A. Hardy.*

JOHNS, J.—1. As we analyze the contract, it was not divisible, and there were no independent cove-

nants. It was complete within itself, executed at one time by certain parties, concerning the one subject matter. The defendants were to furnish the sawlogs and advance the money. The plaintiffs were to manufacture the logs into ties and side lumber. There was a stipulated price for the cost of both the logs and the lumber. In the very nature of things, the mill could not be operated without sawlogs or money. The agreement of the defendants to advance the money for operating expenses was a primary consideration which entered into and was a part of the contract.

2. The Circuit Court found that the defendants violated the contract in their refusal and neglect to deliver logs. It was agreed that the mill had a capacity of 20,000 feet per day. Up to March 31, 1918, not more than 750,000 feet of logs were delivered. It is a matter of common knowledge that in that section of the state the high-water period is during the winter months. If the logs were to be delivered by way of Poodle Creek, it would have to be during that season. But the fact remains that the specified amount of timber was not delivered; that it was not ready for delivery; that up to March 31, 1918, under its normal capacity, the mill could have cut about 1,500,000 feet of lumber, but that no more than 750,000 feet of logs were delivered.

We have carefully read the voluminous record in this case, and agree with the trial court that the contract was not modified, that it was breached by the defendants, and that their failure to perform was not due to any of the exceptions specified in the contract.

3. The right of the defendants to enforce the lien is not independent. It arises from the provisions of the written contract. On principle, the case of

*Burkhart* v. *Hart,* 36 Or. 586, 589 (60 Pac. 205, 206), is in point here. It was there held that:

"The modern doctrine is that a contract should be construed according to the meaning and intention of the parties."

Quoting with approval from Clark on Contracts, 656, the opinion goes on to say:

"It is sufficient to say that, 'in the absence of very clear indications to the contrary, promises, each of which forms the whole consideration for the other, will not be held to be independent of one another, and a failure of one party to perform on his part will excuse the other from liability to perform.'"

The lien here in question is founded upon the contract, and does not exist as a matter of right. Since they breached the contract, the defendants cannot assert and enforce a lien under its terms and provisions.

4. Counsel for the defendants cite authorities to the effect that a party cannot rescind a contract and then recover damages for its breach. That is the law. But it is not the ground upon which the plaintiffs' cause of action was founded. Where one party to a contract breaches it, the other has the option of treating it as broken, and recovering as damages the profits which he would have realized if it had been fully performed. Legally speaking, that is not a rescission, but constitutes an acceptance of the situation brought about by the party who broke the contract. Here the plaintiffs allege that in good faith they kept and performed their part of the contract, and the evidence is conclusive that they were ready to, and did, saw all of the logs furnished, and as fast as they were delivered. They vigorously protested against the shortage of logs until March 31, 1918, when they were

forced finally to close the mill for want of logs. The contract was definite and certain, calling for the delivery of 20,000 feet of lumber per day for the period of one year. The facts show that an average of only 7,000 feet per day was delivered during the time the mill was operated, and no valid excuse is shown for the shortage.

The rule is thus laid down in *Longfellow* v. *Huffman,* 49 Or. 486, 491 (90 Pac. 907, 909):

" 'It is well settled,' says the Supreme Court of Illinois, 'that, where one party repudiates the contract and refuses longer to be bound by it, the injured party has an election to pursue either of three remedies: He may treat the contract as rescinded, and recover upon *quantum meruit* so far as he has performed; or he may keep the contract alive for the benefit of both parties, being at all times himself ready and able to perform, and at the end of the time specified in the contract for performance sue and recover, under the contract; or he may treat the repudiation as putting an end to the contract for all purposes of performance, and sue for the profits he would have realized if he had not been prevented from performing. In the latter case the contract would be continued in force for that purpose. Where, however, the injured party elects to keep the contract in force for the purpose of recovering future profits, treating the contract as repudiated by the other party, in order to such recovery, the plaintiff must allege and prove performance upon his part, or a legal excuse for nonperformance': *Lake Shore & M. S. Ry. Co.* v. *Richards,* 152 Ill. 80 (38 N. E. 777, 30 L. R. A. 33)."

In the instant case the plaintiffs have elected to treat the breach by the defendants as an end to the contract, and have brought their action for profits which should have accrued at the time of the breach. The testimony is conclusive, and supports the finding

.of the Circuit Court that the plaintiffs were damaged in the sum of $500. The defendants' legal contentions are sound, but they are not sustained by the facts.

The judgment is affirmed.

McBRIDE, C. J., and BEAN and BENNETT, JJ., concur.